IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-CR-30033 |
| | ) | |
| TYRON D. FREEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant Tyron Freeman's Motion to Dismiss Charge (d/e 25), which the Court construes as a Motion to Suppress Evidence. Freeman is charged with possession with intent to distribute five or more grams of cocaine base (crack). Indictment (d/e 2). On August 3, 2010, Freeman filed the pending Motion to Dismiss Charge pro se. Defense counsel subsequently adopted the motion. See Minute Entry, dated August 31, 2010. The motion is now fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for an evidentiary hearing and Report and Recommendation. See Text Order, dated August 16, 2010. An evidentiary hearing was held September

24 and 27, 2010. After carefully considering all of the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion to Dismiss Charge be DENIED.

## I. BACKGROUND

Based upon the testimony heard in open court, Freeman encountered law enforcement officials on July 28, 2008, while a passenger in a vehicle driven by Brent Garner. On July 24, 2008, officers of the Springfield, Illinois Police Department (SPD) were working with a confidential source, CS#1, identified at the hearing as Terrence Carter, in an attempt to set up controlled narcotics transactions. Earlier in July 2008, officers executed a search warrant at Carter's residence. During the search of Carter's residence, officers discovered seven to eight ounces of crack cocaine, three firearms, and a small amount of heroin. Carter, who had previously served time in the Illinois Department of Corrections, indicated that he wanted to cooperate with law enforcement. Carter stated that he could cooperate against an individual known as "Banks." July 24, 2008 marked Carter's first attempt at cooperation. Carter made recorded telephone calls to a phone number identified as 361-1275 and spoke with a

raspy-voiced individual.  Carter attempted to set up a controlled transaction at the 709 Liquor store, but no one showed up.  Carter informed law enforcement officials that the raspy-voiced individual did not sound like Banks.

On July 28, 2008, Carter made a second attempt at cooperation. Carter made a series of six recorded telephone calls to 361-1275, in the presence of SPD Officer James Cordery, in an attempt to set up a drug transaction.  A recording and a transcript of the calls were admitted into evidence.  Government's Ex. 1A (CD) and 1T (transcript).  In the first call, Carter told the raspy-voiced individual that he needed at least "6 Bs." Officer Cordery testified that in his experience, "6 Bs" is a reference to six eight-balls of crack cocaine.  The individual told Carter that he would meet him at the Save-A-Lot on Clearlake.  Carter replied, "Hey!  Now remember you still gonna throw me something for, for dude and them, man." Government's Ex. 1T, p. 2.  The individual replied, "Yeah, I ain't got it. . . . It's tight right now, man. . . probably on the next go around."  Id.

Following the first call, Officer Cordery, who was at the Drug Enforcement Agency (DEA) office with Carter, contacted SPD Officer Tammy Baehr by radio and told her that the transaction was to take place

at the Save-A-Lot grocery store on Clearlake Avenue in Springfield. Officers set up surveillance at the Save-A-Lot at approximately 4:00 or 5:00 p.m. on July 28, 2008.  Baehr testified that she was a part of the surveillance team.  According to Baehr, it was sunny and clear at the time of the surveillance.  Baehr was seated in the passenger seat of a DEA sport utility vehicle on the scene and had a clear view of the Save-A-Lot parking lot.

In the second and third calls, Carter stated that he was inside Save-A-Lot, and the raspy-voiced individual informed Carter that he would be at the Save-A-Lot in two minutes.  In the fourth call, the raspy-voiced individual informed Carter that he was outside in the lot.  In the fifth and sixth calls, the raspy-voiced individual informed Carter that he was by the door.

According to Officer Baehr, when she was first advised of the phone calls setting up the drug transaction, Baehr observed four or five unoccupied vehicles in the Save-A-Lot parking lot.  Baehr then observed a silver minivan arrive, with two African-American occupants, and park near the entry/exit of the store.  No one got in or out of the silver minivan.  Baehr was advised that the person Carter was speaking to on the phone stated that he was near the doors of the store.  According to Baehr, the minivan

stayed a short time, then pulled out of the parking lot, heading south on White City Road.

Officer Baehr testified that, at this point, she asked for a marked squad car to make a traffic stop of the minivan. The SUV that Baehr was riding in followed the minivan behind the marked squad car. Baehr observed the silver minivan fail to signal properly when turning onto Monroe Street from White City Road. According to Baehr, uniformed officers effectuated a traffic stop and removed the occupants from the silver minivan. Baehr testified that Brent Garner was the minivan driver and Defendant Freeman was the passenger. Baehr noticed that Freeman had a raspy voice.

SPD Officer John Shea testified that he was on patrol on July 28, 2008 when narcotics detectives asked him to conduct a traffic stop on a silver minivan. Shea testified that the minivan failed to signal properly at White City Road and Monroe Street, estimating that the minivan signaled approximately thirty feet before the corner, rather then the requisite one hundred feet. Shea initiated a traffic stop. The minivan pulled over in a driveway at 220 Paul Street, and Shea pulled his car in behind it. Shea testified that, as soon as the minivan was pulled over, narcotics detectives advised him that there was probable cause to arrest both subjects. Shea,

who was working with a partner, had the two individuals step out of the minivan and placed them under arrest.  Shea searched Garner and Freeman incident to arrest.  Both men were compliant.  No narcotics were found on their persons.  Shea noticed that Freeman had a coarse, rough voice; however, Shea acknowledges that he did not include this detail in the police report he wrote on the night of the incident.

Baehr testified that she then had contact with Officer Cordery regarding the phone that had been used in the recorded conversations. Officer Cordery testified that he had Carter make a seventh call to 361-1275 after Cordery was informed that the minivan had been pulled over and the occupants had been secured.  At the time the seventh call was placed, Cordery was in radio communication with officers on the scene of the traffic stop.  Baehr testified that, at the time the seventh call was placed, she heard a phone ring inside the silver minivan.  According to Baehr's testimony, there were two phones sitting on the ledge/armrest on the passenger side door, and one phone rang.  Baehr acknowledges that she did not note the exact location of the phones in the police report she wrote on the night of the incident.  After the series of recorded phone calls were placed, Cordery showed Carter photographs of Garner and Freeman. Carter identified Garner as "Banks" and Freeman as "Big D."

A canine unit was called to the scene. The trained canine, Tango, performed a free air sniff of the minivan and alerted on the back of the van. At the time the canine alerted, Garner and Freeman were approximately five to six feet away from the minivan. The minivan was searched by officers, but no contraband was found. Baehr testified that, after the search of the van, Officer Pletsch telephoned Assistant State's Attorney Amy Wolfe and asked whether the men should be arrested or whether a search warrant should be obtained for a search of the individuals. According to Baehr, ASA Wolfe said arrest them.

Freeman and Garner were transported to the Springfield Police Department. Officer Baehr testified that she transported Freeman in the SUV. Officers attempted to interview Freeman at the Police Department, but he declined to speak with them. Officer Shea was standing guard of Freeman at the Police Department. Shea testified that he observed Freeman fidgeting in his seat as if he was uncomfortable. Shea stated that this did not seem natural. Shea believes he reported this to Detective Pletsch. Shea acknowledges that he did not include this information in his report.

Freeman was then transported to the Sangamon County Jail. Officer Baehr requested that jail personnel conduct a strip search of both Freeman

and Garner. Officer Baehr testified that, on May 29, 2008, a confidential source, identified as CS#2, told her about an individual known as "Big D" or "Tyron," who would conceal narcotics "in his butt" for transportation and delivery. CS#2 told Baehr that he had witnessed "Big D" conceal narcotics in this way on one occasion, when the men were on a trip to Chicago and were pulled over by police. CS#2 admitted to Baehr that he was involved in drug trade and told her that he had been addicted to crack cocaine for a year. Baehr asked SPD officers on the street whether they were aware of anyone using these names. She learned that Tyron Freeman was also known as "Big D." Baehr obtained a state identification card photograph of Freeman and showed it to CS#2 prior to July 28, 2008. CS#2 identified the person in the photograph as "Big D."

Defense counsel questioned Baehr extensively regarding the reliability of CS#2. According to Baehr, between June 2, 2008 and July 28, 2008, CS#2 helped with three or four controlled narcotics purchases and two search warrants. With respect to the first search warrant, CS#2 informed law enforcement officials that crack cocaine and marijuana would be found. When the warrant was executed, crack cocaine and marijuana were discovered. Baehr testified that charges were brought based on this discovery, but later dismissed. With respect to the second search warrant,

CS#2 informed law enforcement that marijuana would be found. Marijuana was found when the warrant was executed. According to Baehr, charges resulted from this discovery, although she was uncertain of the current status of that case. Officer Baehr testified that CS#2's criminal history report showed five to ten arrests for offenses including burglary, forgery, and retail theft. Officer Baehr testified that CS#2 had a prior conviction, although she did not know the nature of the offense. According to Baehr, CS#2 was on parole when she spoke with him and also had a pending forgery charge. Baehr stated that she contacted a state prosecutor to inform her that CS#2 was cooperating with law enforcement.

Officer Shea testified that he was present when the strip search was conducted at the Sangamon County Jail. Freeman's clothing was removed. A search of the clothing revealed no contraband. Shea testified that it appeared that Freeman was "clenching his butt cheeks." Jail personnel advised Freeman that, if law enforcement officials had to perform a body cavity search and it was discovered that Freeman had contraband on his person, Freeman would be charged with an additional felony, i.e. bringing contraband into a penal institution. At that point, Freeman appeared deflated, unclenched his butt cheeks, reached down, and removed a plastic baggie with a white rock-like substance from the

crack of his butt.  Shea took possession of the substance and transferred it to narcotics officers.  The substance was later determined to be approximately 31 grams of crack cocaine.

At the hearing on the Motion to Suppress, the defense clarified an intent to proceed on two issues.  First, Freeman contends that authorities lacked probable cause for his stop/arrest, and thus, the crack cocaine uncovered during the strip search should be suppressed as fruit of the poisonous tree.  See Wong Sun v. United States, 371 U.S. 471 (1963). Freeman further asserts that no reasonable suspicion existed to justify the strip search.

## II.  ANALYSIS AND CONCLUSIONS OF LAW

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. A defendant seeking to suppress evidence because of a violation of the Fourth Amendment must first establish that he has standing to challenge the search or seizure. United States v. Sweeney, 688 F.2d 1131, 1143 (7th Cir. 1982).  Clearly, Freeman has standing to challenge both the seizure and search of his person. Because stop/arrest and search were performed without warrants, the burden of proof shifts to the Government.

Warrantless searches are "per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). The Government bears the burden of establishing by a preponderance of the evidence that an exception to the warrant requirement applies. United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000). A warrantless arrest is reasonable when there is probable cause to believe that a criminal offense has been or is being committed. United States v. Watson, 423 U.S. 411, 417-424 (1976).

The Court turns first to the traffic stop. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment and must be reasonable. See Whren v. United States, 517 U.S. 806, 809-10 (1996). The evidence supports a finding that probable cause existed for a traffic stop in that Officers Baehr and Shea observed the silver minivan turn from White City Road onto Monroe Street without signaling as required by 625 ILCS 5/11-804(b).[1] The decision to stop an automobile is reasonable when the

---

[1]Under 625 ILCS 5/11-804(b), "A signal of intention to turn right or left when required must be given continuously during not less than the last 100 feet traveled by the vehicle before turning within a business or residence district, and such signal must be given continuously during not less than the last 200 feet traveled by the vehicle before turning outside a business or residence district."

police have probable cause to believe that a traffic violation has occurred. Whren, 517 U.S. at 810.   The officers' subjective motivations are irrelevant as long as probable cause exists to justify the seizure.  Id. at 812-13.  The traffic stop in the instant case was not unconstitutional.

The Court turns its attention to the arrest.  "'In order to make an arrest without a warrant, the police must have probable cause, under the totality of the circumstances, to reasonably believe that a particular individual has committed a crime.'"  United States v. Oliva, 385 F.3d 1111, 1114 (7th Cir. 2004) (quoting United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995)).  "Probable cause exists if police officers possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that [the] suspect has committed, or is committing, a crime."  United States v. Venters, 539 F.3d 801, 807 (7th Cir. 2008) (internal quotations and citations omitted). "[P]robable cause can be established by an informant's tip along with corroboration by police work."  United States v. Banks, 405 F.3d 559, 570 (7th Cir. 2005). Additionally, when law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine.  United States v.

<u>Hensley</u>, 469 U.S. 221, 231-33 (1985); <u>United States v. Lenoir</u>, 318 F.3d 725, 728 (7th Cir. 2003).

The record contains conflicting evidence concerning the exact point at which Freeman was placed under arrest. Officer Shea testified that, as soon as the minivan was pulled over, he was advised that there was probable cause to arrest both subjects, so Shea and his partner had Garner and Freeman step out of the minivan and placed them under arrest. Officer Baehr testified that, after the van was searched, Officer Pletsch called a state prosecutor to ask whether Freeman and Garner should be arrested. Considering the record as a whole, the Court believes that the appropriate point to begin the analysis is the point at which Shea testified that Freeman was placed under arrest.

At that point, officers had overheard the six phone calls placed by Carter, which, despite Freeman's arguments to the contrary, clearly attempt to set up a drug transaction.[2] Additionally, consistent with the information exchanged in the phone calls, officers had observed the silver minivan arrive at the Save-A-Lot, park by the doors, and leave without

---

[2]Freeman argues that the recorded phone calls do not evidence a meeting of the minds regarding a drug purchase. It is undisputed that parties to a drug transaction often use code words or slang, and Officer Cordery testified that "6 Bs" is a reference to six eight-balls of crack cocaine. Additionally, the raspy voiced individual did not respond "I ain't got it" to the request for "6 Bs," rather, "I ain't got it" was the response when Carter asked him to "throw me something for, for dude and them, man." When Carter stated he needed "6 Bs," the raspy voiced individual directed Carter to meet him at the Save-A-Lot on Clearlake Avenue.

anyone entering or exiting the vehicle.  Under the totality of the

circumstances, probable cause existed to believe that Garner and Freeman

had committed a crime, i.e., attempted distribution of a controlled

substance.[3]  The instant case is similar to United States v. Carrillo, in which

the Seventh Circuit affirmed a conviction for attempted possession with

intent to distribute controlled substances after noting that the defendant

had been recorded negotiating a drug deal, was apprehended fleeing the

place where the deal was to occur, and was found to be in possession of

cash in an amount consistent with the recorded negotiations.  Carrillo, 435

F.3d 767, 777

(7th Cir. 2006).  It was lawful for Shea to arrest Freeman as soon as the

minivan was stopped.

    Even if the information known at the time the minivan was stopped

did not rise to the level of probable cause to arrest Defendant Freeman, it

quickly blossomed to that level as the stop progressed.  The Court is

cognizant of the fact that a seizure justified solely by the need to issue a

traffic ticket "can become unlawful if it is prolonged beyond the time

reasonably required to complete that mission."  Illinois v. Caballes,

_____

[3]Under 21 U.S.C. § 841(a)(1), it is unlawful to possess a controlled substance
such as crack cocaine with the intent to distribute it.  Section 846 of Title 21 makes
unlawful an "attempt" to commit the criminal act proscribed by § 841(a)(1).

543 U.S. 405, 407 (2005). "However, information lawfully obtained during that period may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." United States v. Figueroa-Espana, 511 F.3d 696, 702 (7th Cir. 2007) (citing United States v. Martin, 422 F.3d 597, 602 (7th Cir. 2005); United States v. Muriel, 418 F.3d 720, 725 (7th Cir. 2005)).

An officer may order the occupants of a vehicle to get out of the car during a routine traffic stop. Maryland v. Wilson, 519 U.S. 408, 410 (1997). Officers Shea and Baehr testified that, after the minivan was stopped, they noticed that Freeman had a coarse or raspy voice. Cordery had Carter place a seventh call to the 361-1275 number, at which point Baehr heard a phone ringing inside the minivan. Baehr observed two phones sitting on the armrest on the passenger side door, one of which was ringing.[4] Freeman had been seated in the passenger set of the minivan. These additional facts clearly establish probable cause to believe that Freeman had committed the crime of attempted distribution of a controlled

---

[4]The evidence reveals that Baehr did not document the precise location of the phones in her police report of the incident. The Court notes that there was no conflict between Baehr's testimony and the information contained in her police report, rather, her testimony merely contained greater detail than the written report. The Court finds the testimony of the law enforcement officers to be credible despite the omissions in their police reports.

substance.  As such, they also reach the lower burden of reasonable suspicion necessary to justify Freeman's continued detention.

A canine sniff of the exterior of a vehicle for narcotics does not implicate Fourth Amendment concerns, providing that the individual is lawfully detained at the time of the sniff.  Caballes, 543 U.S. at 409; see also United States v. Johnson, 2008 WL 187559, at *4 (C.D. Ill. January 18, 2008) ("Adding a dog sniff of the exterior of a vehicle to a lawful traffic stop executed in a reasonable manner does not violate the Fourth Amendment.").  The record evidence supports a finding that Freeman was lawfully detained at the time Tango performed the free air sniff of the minivan.  Once the trained dog alerted on the vehicle, the officers had probable cause to believe that narcotics were present, especially when considered in light of all of the other information known to them at the time. See United States v. Ganser, 315 F.3d 839, 844 (7th Cir. 2003).  The officers' subsequent fruitless search of the minivan does not invalidate the probable cause determination.  Indeed, as the Tenth Circuit has noted, while a fruitless search of a vehicle following a dog alert diminishes the probability of contraband in the vehicle, it increases the chances that the substance to which the dog had alerted would be found on the person of individuals who had been removed from the vehicle.  United States v.

Anchondo, 156 F.3d 1043, 1045 (10th Cir.1998). This conclusion is buttressed by the fact that Officer Baehr had information from a source proved reliable in the past that, on a prior occasion, Freeman had concealed narcotics in his butt when pulled over by the police. Freeman's arrest was not unconstitutional.

Finally, the Court addresses the propriety of the strip search performed at the Sangamon County Jail. The Supreme Court has recognized the use of strip searches as a valid means of preventing detainees from smuggling drugs into detention facilities. Bell v. Wolfish, 441 U.S. 520, 559 (1979). The Seventh Circuit has characterized strip searches involving visual inspection of the anal and genital areas as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission" and has noted that "[t]he more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted." Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272-73 (7th Cir. 1983) (internal quotations and citations omitted). In the pretrial detention setting, law enforcement officials may conduct a strip search of an individual arrested on even a minor offense when they have reasonable

suspicion at the time of the search to believe that the individual is concealing contraband on his body.  See Kraushaar v. Flanigan, 45 F.3d 1040, 1045 (7th Cir. 1995).

The facts of the instant case support a finding that reasonable suspicion existed for a strip search.  Police had overheard a raspy voiced individual using the phone number 361-1275 set up a drug transaction with Carter.  The 361-1275 phone was located on the passenger side door of the minivan.  Freeman had been seated in the passenger seat of the minivan and had a raspy voice.  A trained canine had alerted on the minivan, but no contraband was found in the vehicle.  Baehr had information that Freeman had on a prior occasion concealed narcotics in his butt when pulled over by the police.  Additionally, Officer Shea had observed Freeman fidgeting uncomfortably and unnaturally in his seat at the police department and clenching his butt cheeks when his clothes were removed at the jail.  The officers' belief that Freeman was concealing narcotics on his body was reasonable, and the strip search of Freeman was lawful.

## III. CONCLUSION

For all the above reasons, I recommend that Defendant Tyron Freeman's Motion to Dismiss Charge (d/e 25), which the Court construes as a Motion to Suppress Evidence, be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within 14 working days after being served with an ECF copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See Local Rule 72.2.

ENTER: October 6, 2010

_____s/ Byron G. Cudmore_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE